IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

DANNY TOWNSEND
Plaintiff

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
MAY 20 2026
ARTHUR JOHNSTON
BY ______ DEPUTY

v. CAUSE NO. 3:26-CV-354-KHJ-MTP

J. DEWAYNE THOMAS, in his individual and official capacity as Chancery Court Judge, TAMETRICE E. HODGES, in her individual and official capacity as Chancery Court Judge, HENRY CLAY, in his individual and official capacity as Municipal Court Judge, JIMMY MORTON, in his individual and official capacity as Justice Court Judge, FAYE PETERSON, in her individual and official capacity as Chancery Court Family Master, EDDIE FAIR, in his individual and official capacity as Tax Collector, EDDIE JEAN CARR, individually and in his official capacity as Chancery Clerk, CHARLES E. STOKES, in his individual and official capacity as Tax Assessor, HINDS COUNTY, JOHN REEVES, CODY GIBSON, PAUL E. ROGERS, TERRIS HARRIS, THE COCHRAN LAW FIRM, SHARON HENDERSON, URSULA MITCHELL, THE HENDERSON LAW OFFICE, HENDERSON MITCHELL LAW GROUP, AHMAD SMITH MARY ARNOLD, in her individual and official capacity as Administratrix,
Defendants

# COMPLAINT
## JURY TRIAL DEMANDED

**COMES NOW** Plaintiff Danny Townsend (hereinafter Plaintiff or Nadir), by and through his attorney of record, the honorable Ishmael Muhammad, and files

this COMPLAINT against the Defendants for the claims and violations listed herein and, in support thereof, would allege to this honorable Court the following, to wit:

## I.
## PARTIES

1. Nadir is an adult black male resident citizen of Hinds County, Mississippi, residing at his homestead as the surviving spouse of Althela Watson Townsend 1474 Wooddell Drive, Jackson, MS 39212.
2. Defendant J. Dewayne Thomas (hereinafter Thomas or Judge Thomas) is an adult white male resident citizen of Hinds County, Mississippi and the presiding chief chancery court judge for the Hinds County Chancery Court, which is an arm of the State of Mississippi, whose physical address is in the state of Mississippi. Defendant Thomas may be served with process by serving the Hinds County Chancery Court Clerk located at 316 South President Street, Jackson, MS 39201.
3. Defendant Tametrice E. Hodges (hereinafter Hodges or Judge Hodges) is an adult black female resident citizen of Hinds County, Mississippi and a relatively newly elected chancery court judge for the Hinds County Chancery Court, which is an arm of State in Mississippi, whose physical address is in the State of Mississippi. Defendant Hodges may be served with process by serving the

Hinds County Chancery Court Clerk located at 316 South President Street, Jackson, MS 39201.

4. Defendant Henry Clay ("Clay") was at all relevant times a Municipal Court Judge in Mississippi, sued in both his individual and official capacities and may be served with process by serving the Jackson Municipal Court Clerk.

5. Defendant Jimmy Morton ("Morton") was at all relevant times a Justice Court Judge in Mississippi, sued in both his individual and official capacities and may be served with process by serving the Jackson, MS Justice Court Clerk.

6. Defendant Faye Peterson ("Peterson") was at all relevant times a Chancery Court Family Master in Mississippi, sued in both her individual and official capacities and may be served with process by serving the Hinds County Circuit Court clerk.

7. Defendant Eddie Fair (hereinafter Fair or Collector) is an adult black male resident citizen of Hinds County, Mississippi and the tax collector for Hinds County, which is an arm of the State of Mississippi, whose physical address is in the state of Mississippi. Defendant Fair may be served with process by serving the Hinds County Chancery Court Clerk located at 316 South President Street, Jackson, MS 39201.

8. Defendant Eddie Jean Carr (hereinafter Carr or Clerk) is an adult black female resident citizen of Hinds County, Mississippi and the clerk for the Hinds County Chancery Court, which is an arm of the State of Mississippi, whose physical

address is in the state of Mississippi. Defendant Carr may be served with process by serving the Hinds County Chancery Court Clerk located at 316 South President Street, Jackson, MS 39201.

9. Defendant Charles E. Stokes (hereinafter Stokes or Assessor) is an adult black male resident citizen of Hinds County, Mississippi and the tax assessor for Hinds County, which is an arm of the State of Mississippi, whose physical address is in the state of Mississippi. Defendant Stokes may be served with process by serving the Hinds County Chancery Court Clerk located at 316 South President Street, Jackson, MS 39201.

10. Defendant Hinds County (hereinafter County) is a subdivision of the State in Mississippi whose physical address is 316 South President Street, Jackson, MS 39201 and may be served with process by serving the Chancery Clerk at that address.

11. Defendant John Reeves ("Reeves") is an adult resident citizen of the State of Mississippi and an attorney licensed to practice law in Mississippi and may be served with process at his law office located at 355 State St, Jackson, MS 39201.

12. Defendant Cody Gibson ("Gibson") is an adult resident citizen of the State of Mississippi and an attorney licensed to practice law in Mississippi and may be served with process at his law office located at 1640 Lelia Dr # 200, Jackson, MS 39216.

13. Defendant Paul E. Rogers (hereinafter Rogers) is an adult white male resident citizen of Madison County, Mississippi, and an attorney practicing in the state of Mississippi with an office located at 567 Hwy. 51, Suite B, Ridgeland, MS 39157 and who may be served with process and that same address.

14. Defendant Terris Harris (hereinafter Harris) is an adult black male resident citizen residing in the State of Mississippi and doing business as an attorney with the Cochran Firm located in Madison County, MS and may be served with process at the Firm's address, 197 Charmant Place, Suite 2, Ridgeland, MS 39157.

15. The Cochran Firm Jackson (hereinafter Cochran) is a law firm with its principal office located in Ridgeland, Ms and doing business in the State of Mississippi offering legal services and may be served with process at the Firm's address, 197 Charmant Place, Suite 2, Ridgeland, MS 39157.

16. Defendant Sharon Henderson ("Henderson") is an adult resident citizen of the State of Mississippi and an attorney licensed to practice law in Mississippi and may be served with process at 1840 SW St, Jackson, MS, 39201.

17. Defendant Ursula Mitchell ("Mitchell") is an adult resident citizen of the State of Mississippi and an attorney licensed to practice law in Mississippi and may be served with process at 198 Charmant Place, Suite 2 Ridgeland, Mississippi 39157.

18. Defendant The Henderson Law Office is a business entity doing business in the State of Mississippi and may be served with process at 1840 SW St, Jackson, MS, 3920.

19. Defendant Henderson Mitchell Law Group is a business entity doing business in the State of Mississippi and may be served with process at 198 Charmant Place, Suite 2 Ridgeland, Mississippi 39157.

20. Defendant Ahmad Smith ("Smith") is an adult resident citizen of the State of Mississippi and an attorney licensed to practice law in Mississippi and may be served with process at 808 N State St, Jackson, MS 39202.

21. Defendant Mary Arnold ("Arnold") is an adult resident citizen of the State of Mississippi who acted as Administratrix of the Estate of Althela Watson Townsend and is sued in both her individual and official capacities.

22. Whenever reference is made in this Complaint to any act of any Defendant, such allegations shall also mean that the officers, agents, employees, representatives, co-conspirators, or other persons acting on behalf of said Defendant committed, authorized, ratified, approved, participated in, or otherwise facilitated such acts while acting within the course and scope of their agency, employment, appointment, authority, or conspiratorial agreement.

23. Whenever reference is made to multiple Defendants, such allegations shall mean that said Defendants acted jointly, severally, in concert, pursuant to

agreement, or under color of law to deprive Plaintiff of rights secured by the Constitution and laws of the United States and the State of Mississippi.

## II.
## JURISDICTION

24. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983, 1985, and 1986.

25. This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as the federal claims asserted herein.

26. Declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

27. This Court has personal jurisdiction over all the Defendants in the instant suit who reside or may be found in the State of Mississippi, or who are doing business in the State of Mississippi. Additionally, the allegations which caused and/or contributed to the subject incidents occurred primarily within the confines of Hinds County, Mississippi.

## III.
## VENUE

28. Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C. § 1391 because the events and omissions giving rise to these claims occurred in Hinds County, Mississippi, which is located within this judicial district.

29. At all relevant times, Defendants acted under color of state law and within the course and scope of their offices, employment, appointments, agency relationships, conspiratorial agreements, or coordinated actions.

30. Plaintiff expressly alleges that numerous actions complained of herein were non-judicial in nature, administrative in nature, investigatory in nature, conspiratorial in nature, private in nature, or otherwise undertaken in complete absence of jurisdiction and outside the legitimate adjudicative function.

## IV. IMMUNITY

31. The Legislature has waived sovereign immunity for "claims for money damages arising out of the torts of such governmental entities and the torts of their employees…." §11-46-5(1) (Rev 2019). The Legislature then established some exceptions to that limited waiver of immunity. The tortious conduct of the individual Defendants herein was not a discretionary function of their employment or position and, therefore, defendant Hinds County **is not** immune.

## V. SUMMARY OF THE CASE

32. This is a civil action brought pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, together with supplemental state-law claims, arising from a years-long conspiracy and coordinated course of conduct undertaken under color of state law to deprive Plaintiff Danny Townsend, an African-American surviving

spouse, of his constitutional rights, property rights, homestead rights, access to courts, and equal protection of the laws.

33. This action arises out of judicial and non-judicial acts, ex parte communications, conspiratorial agreements, racially discriminatory treatment, abuse of judicial authority, manipulation of court proceedings, deprivation of property without due process, denial of meaningful access to hearings, retaliatory conduct, and coordinated efforts to interfere with Plaintiff's possessory, contractual, insurance, inheritance, and homestead interests in the marital residence located at 1474 Wooddell Drive, Jackson, Mississippi.

34. On July 15, 2017, Ms. Althela Townsend made her transition from this life into the hereafter leaving behind her surviving spouse, Nadir (the Plaintiff herein, Mr. Danny Townsend).

35. What ensued after that has been a campaign of terror against Nadir to effectively rob him of his marital rights, his marital property, his homestead, his rights as the surviving spouse, and the opportunity to grieve the loss of his wife, all coordinated and directed by Thomas.

36. Plaintiff alleges that Defendant J. Dewayne Thomas, while serving as a Chancery Court Judge in Hinds County, Mississippi, acted outside the protections of legitimate judicial conduct by continuing attorney-client and personal relationships with parties interested in litigation before him, engaging in ex parte coordination and non-judicial conduct, directing and influencing

litigation strategy, manipulating case assignments, shielding favored parties from accountability, depriving Plaintiff of hearings and rulings, and using judicial authority to advance private interests and racially discriminatory objectives.

37. Plaintiff further alleges that multiple attorneys, court officials, municipal actors, and private individuals acted jointly and in concert with state actors under color of law to deprive Plaintiff of constitutional and property rights guaranteed by the First, Fifth, Seventh, and Fourteenth Amendments to the United States Constitution.

38. The conspiracy to harm Nadir continues to this day and has been accomplished through several connected and related actions with the most recent action being the forced sale of his homestead.

39. At first glance, it might appear to the uninformed observer that Nadir is taking issue with judicial decisions that he disagrees with that are properly addressed through an appeals process; he is not. In fact, Thomas has used and orchestrated the use of the blackout curtain of the gavel and rulings from the bench to hide behind in his efforts to look out for his attorney clients and personal relationships under the cloak of judicial authority to "make wrongdoing fair seeming."

40. Plaintiff seeks compensatory damages, punitive damages, declaratory relief, *injunctive relief, recusal-related relief, attorney's fees, costs, and all additional* relief authorized by federal and Mississippi law.

## V.
## UNDERLYING FACTS

41. On October 10, 2002, Althela Townsend acquired the property at 1474 Wooddell Drive, Jackson, MS 39212, under her then married name Althela Green, that is central to the Complaint and Allegations being made herein;

42. After Louis Green died, Althela Townsend, then Althela Green, hired Defendant Thomas to represent her and her daughter with Louis Green, Keiona Green, in the matter of the estate of Louis Green, and in the matter of the Guardianship of Keiona Green (see Exhibit L, Representation Letter Attached to Doc 31, Motion for Recusal, Estate Case);

43. Defendant Thomas, Attorney and Counselor at Law, created the estate for the deceased, Louis Green, and opened a guardianship for Keiona Green;

44. On information and belief, Thomas continued representing Althela Townsend as her private attorney and counselor at law up until she made her transition from this world on July 15, 2017, all while sitting as a Hinds County Chancery Court Judge, in violation of the Mississippi Code, Section 9-1-25 and 23-15-975;

45. On information and belief, Thomas also continued his representation of Keiona Green in the matter of her guardianship and as her family attorney up until the transition of Althela Townsend and after, continuing until the present;

46. In August 2006, Althela Townsend married Nadir, at which time she discontinued use of her prior marital last name Green;

47. During the course of their marriage, Nadir and Althela Townsend lived in their home at 1474 Wooddell Drive as their homestead and updated Althela Townsend's insurance policy on their home to make the Plaintiff recognized as an insured under the policy and the beneficiary in case of Althela Townsend's death in which case the insurance policy's term life provision would ensure that the home was paid off to the benefit of the Plaintiff;

48. Plaintiff and his wife attempted to convert the insurance policy to one jointly owned with the proper name for Althela Townsend reflected on the policy pursuant to marriage but the insurance company informed them that due to the state of insurance law, any change to the original policy holder would result in the loss of the term life provision under the policy to which Althela Townsend was grandmothered in under her prior marital name Althela Green;

49. Instead of losing the term life provision, the insurance agent informed the Plaintiff that he and his wife could ensure the same protections, ie, that the home would stay under their ownership as husband and wife and any benefits

would accrue to Plaintiff upon his wife death, by making the Plaintiff the beneficiary of the policy;

50. While lawfully married to Althela Townsend, Plaintiff received several documents, including checks, from Nationwide, the insurance provider for their home, as a recognized insured and beneficiary under his spouse's policy;

51. On July 15, 2017, Mrs. Althela Townsend transitioned from this life while Plaintiff was incarcerated and while at least two of Althela's adult children were living in her and the P laintiff's home, along with several of Althela's grandchildren;

52. On information and belief, immediately upon the death of Althela Townsend, Defendant Thomas communicated with one or more of Althela Townsend's adult children providing legal advise concerning how to proceed on protecting their mother's assets and gaining permanent possession and ownership of Nadir and Athela's home;

53. On information and belief, Defendant Thomas explained to Keisha, Althela's other adult children, and/or Defendant Cody Gibson, that, in effect, it could not be him that represented them for the record because it would come back on him given that he was a Judge now, but that he would do everything he could for them behind the scenes as their Judge;

54. On September 19, 2017, Nadir had an appraisal for the value of the house done by the insurance company in his name as the surviving spouse and sole beneficiary of the policy;

55. On that same date, Keisha Gordon filed a suit to quiet title seeking recognition as one of the heirs of her mother, and seeking ownership of her mother and Nadir's home and other marital property;

56. On information and belief, Keisha had already been advised by Defendant Thomas on filing the suit and was advised by Defendant Thomas after learning that the insurance company was recognizing Nadir as the owner, to file the suit asap;

57. Although the assignment of matters to judges in Chancery Court is supposed to occur randomly, the case was placed directly with Defendant Thomas;

58. On information and belief, Defendant Thomas and Defendant Clerk Carr colluded to ensure that the case was placed with Defendant Thomas at his direction and insistence, and due to his attorney-client and personal relationship with Althela and/or one or more of her adult children;

59. On information and belief, Defendant Thomas provided direction to Keisha and/or other siblings and/or Keisha's attorney, to inform them of what action to file and how to file it to ensure he had control over the case to protect them and represent take care of them as their family attorney and/or friend;

60. After his wife made her transition, Nadir took over the mortgage payments on their home up until December of 2017 when the insurance company finally paid off the mortgage remaining on the home as of the transition date of the insured pursuant to the credit life provision of the insurance policy;

61. On or about November 15, 2017, the insurance company paid off the mortgage for Althela and Nadir's home;

62. On that same day, Keisha amended her initial complaint to add a false allegation that she and her siblings had paid off the mortgage and that Plaintiff should be required to pay the amount representing his alleged share of the ownership or loss his ownership interest in his homestead and domicile;

63. After the insurance company paid of the house and Keisha amended her complaint, Trustmark, the bank that received the mortgage payoff check from the insurance company, cut a check in the name of the deceased insured "Althela Green" to reimburse the mortgage payments Nadir made after Althea's transition (see Exhibit A, Reimbursement Check for Mortgage Payments attached to Doc 35, Motion to Pursue Claim, in Quiet Title case);

64. On information and belief, Defendant Thomas, in collusion and communication with Keisha, her attorney of record Defendant Cody Gibson, and/or her siblings, planned a hearing on Keisha's lawsuit for January 22, 2018, and to serve Nadir with summons for the same, with the expectation that he would fail to respond, or would still be in jail and unable to attend, or would otherwise not take any

action to stop Defendant Thomas from giving Keisha everything she was asking Defendant Thomas for in her amended complaint;

65. Nadir was served with the amended complaint and summons for the January 22, 2018 hearing and did respond, moving for Keisha's suit to be dismissed for being improper on its face, asserting that the proper action was to open an estate to probate the house and other assets, and requesting transportation be provided by the Court to attend the hearing (see Exhibit B, 12/27/17 pro se Motion for Transport and to Dismiss, Doc 9 in Quiet Title suit);

66. On January 18, 2018, in response to Nadir's Motion, Defendant Thomas granted Nadir transportation to the hearing;

67. On information and belief, the very next day, Defendant Thomas, in collusion and communication with Defendant Clerk Carr, issued a new summons with a new date of March 27, 2018 for the hearing on Keisha's lawsuit, avoiding the January 22 hearing date;

68. On information and belief, Thomas orchestrated and made this decision with the assistance of Defendant Clerk Carr on behalf of Keisha because of his attorney-client and/or personal relationship;

69. On information and belief, Defendant Thomas orchestrated and made this decisions with the assistance of Defendant Clerk Carr because the previous plan, to have a hearing without Nadir present in order to make a decision in favor of Keisha and/or Althela's other adult children, to the detriment of Nadir,

had been spoiled and upset by Nadir's response and it was in the best interest of Keisha, the other adult children and/or Defendant Thomas to take some time so they could get a new plan together to take Nadir's home from him;

70. On information and belief, Defendant Thomas orchestrated and made this decision, with the assistance of Defendant Clerk, knowing and being aware that Nadir was scheduled to be released from incarceration in January of 2018, and with knowledge that Keisha, other adult children of Althela, and Althela's grandchildren, were living in Nadir's home, and knowing already that the home belonged to Nadir, and was his homestead, and wanting to give the adult children and grandchildren more time to remain their living before Defendant Thomas was forced by the law to make them leave;

71. Later on that same day, Defendant Thomas admitted to having an unscheduled, impromptu, ex parte hearing on Keisha's amended complaint that was not noticed to Nadir, did not include Nadir, and did not provide for an opportunity for Nadir to be heard, where allegedly, pursuant to an "ore tenus" Motion to Continue from someone or somewhere unnamed in his order, Defendant Thomas "agreed" that the hearing should be continued to the same date for which Defendant Thomas had already issued a summons for in advance (see Exhibit C, 1/19/18 Order Continuing Hearing to 3/27, Doc 12 in Quiet Title suit);

72. On information and belief, Defendant Thomas had personal and/or attorney client relationship-based ex parte conversations with Keisha, Althela's other adult children, and/or Defendant Gibson, addressing changing the court date to give them more time to get a plan together for dealing with Nadir's response and figure out how to get them to be able to own the house and stay in it;

73. Based on the summons, Defendant Thomas had decided to continue the hearing before the alleged hearing on the amended complaint and before the order of continuance;

74. Nadir was subsequently transported to the Court on January 22, 2018 for the hearing on Keisha's amended complaint;

75. Upon his arrival, only he and Keisha were present for the hearing and they where told that the hearing had been continued;

76. On information and belief, Keisha was already aware that the hearing had been continued but had been advised through Defendant Thomas that she should still show up to give the appearance that she had no knowledge;

77. Soon thereafter, on January 26, 2018, Nadir was released from the correctional facility and was unable to go home due to his home being adversely occupied and possessed by Keisha and other siblings and their children;

78. On February 21, 2018, while still unable to return home, Nadir filed his second response to Keisha amended complaint through his attorney, Defendant Rogers, in which Nadir admitted to Althela's adult children having an ownership interest

in the real property subject to his right to an "exclusive life estate," included a petition to open an estate for Althela, and initiated a Complaint seeking an accounting and inventory of all the personal property and assets and a return of any personal property or assets that had already been taken by the adult children (see Exhibit D, 2/21/18 Response, Doc 15 in Quiet Title case);

79. On March 22, 2018, almost a month after Nadir filed his response and just five days before the March 27, 2018 hearing, Keisha filed her rebuttal to Nadir's response, arguing that he is not entitled to "homestead,", asking that his petition to open an estate be denied, and seeking denial of any accounting or computing based on falsely asserting that Althela had no other assets other than the real property and that there was no personal property or other assets of any kind;

80. The issue of Nadir's homestead rights was not Nadir's issue, it was Keisha's (Nadir already had a homestead recognized by Defendant Clerk, Defendant Assessor, and Defendant collector); Nadir sought a life estate given that as the sole life tenant, he would be considered the full and sole owner of the property for taxation purposes;

81. A hearing was held on March 27, 2018, allegedly to address all the concerns that had been raised in the lawsuit by both parties;

82. Following the hearing, Defendant Thomas ruled on the heirship and held in abeyance Keisha's homestead issue and her Petition to Quiet Title (Exhibit E, 4/17/18 "Agreed" Final Order filed a month later on 5/17/18, Doc 32, Quiet

Title suit, referencing Defendant Thomas making his decision about the heirs on March 27, 2018);

83. On information and belief, Defendant Thomas disregarded all of the issues that Nadir raised because addressing those was not in the best interest of his client(s);

84. On April 3, 2018, Defendant Thomas filed his order adjudicating the heirs of Althela as her five adult children and Nadir which Defendant Thomas had already determined at the hearing on March 27, 2018 a week earlier (see Exhibit E showing heirship determined a week before);

85. Defendant Thomas also asked the parties to provide him with proposed findings and conclusions of law solely as to Keisha's challenge to Nadir's homestead;

86. On information and belief, Defendant Thomas had already determined that his hands were tied as to Keisha's desire to take away Nadir's right to his homestead, and had communicated the same to his client(s) (ie, Keisha and/or the other adult children of Althela);

87. On information and belief, Defendant Thomas had also devised a plan to focus the litigation around Keisha's denial of Nadir's homestead rights and granting her Amended Petition to Quiet Title with the intention of not granting Nadir any of the things he had actually requested, including an accounting, an opening of an estate for Althela, and the granting of a life estate, and Defendant Thomas had communicated the same to his client(s);

88. On information and belief, Defendant Thomas had also assured his client(s) that he would do all he could to make sure they would be able to continue to live at the house with Althela's grandchildren;

89. On information and belief, on April 3, 2018 or before, Defendant Thomas had already made his decision on what he was going to do regarding Keisha's desire to take away Nadir's homestead;

90. On April 5 and April 9 respectively, Nadir and Keisha filed their proposals solely on the issue of Nadir's right to homestead, ignoring all the other issues as desired by Defendant Thomas because adjudication of those was not in the best interest of his client(s);

91. On April 10, 2018, a week after his April 3 order and decision was filed, Defendant Thomas filed his order claiming that Nadir had requested to have the Court "recognize and grant his statutory homestead rights" and that Keisha had "opposed" Nadir's request when, in fact, it was the other way around and Keisha had actually opposed Nadir's homestead when Nadir had not requested a recognition or grant of homestead at all from Defendant Thomas given that it was something he already possessed (see Exhibit F, 4/10/2018 Order Affirming Homestead, Doc 29 in Quiet Title suit);

92. In his April 10 order, Defendant Thomas also admitted that his client, Keoina Green, was the actual petitioner in the suit to quiet title, authored and conceived for her by her lawyer, Defendant Thomas himself, instead of Keisha Gordon;

93. Defendant Thomas confessed in his order that he only found that Nadir is entitled to his homestead "based on the foregoing,"

    a. "This Court is sympathetic to the situation in which the children and grandchildren of Althela find themselves. Clearly, it would be an unfortunate matter for the grandchildren to be removed from the home in which they have resided for the greater portion of their lives. Danny Townsend has maintained that he does not desire to evict the children and grandchildren from the residence. This Court is hopeful that some compromise can be reached that will allow the heirs to remain in the residence while affording Danny his statutory rights."

94. Finally, Defendant Thomas' order reveals facts known from his attorney-client and/or personal relationship with the adult child(ren) of Althela given that those facts don't otherwise appears in any of the court record of the proceedings before Defendant Thomas;

95. On April 10, after Defendant Thomas told his client(s) through his order that Nadir had a right to return to his home and enjoy the peaceful and undisturbed use of the same, Nadir was finally able to safely return to the home he shared with his now deceased wife who had passed away while Nadir was incarcerated, almost two and half months after release from detention…or so he thought;

96. Nadir immediately met with resistance from Keisha who maintained control over the keys to access the home along with her siblings;

97. Notwithstanding that Nadir arrived at his home with a police escort and Defendant Thomas' order in hand, Keisha refused to provide the keys or allow

Nadir into the home and Nadir had to access his home by going through a window with the permission of the police escort;

98. Keisha put a call out to her siblings and other family members and several family members arrived at the house protesting Nadir's occupancy;

99. The police ultimately dispersed the crowd and arrested Keisha that same day after running a background check on her due, to her belligerent and confrontational behavior, and discovering she had an outstanding warrant;

100. Later that evening, one of Althela's adult children drove by Nadir's house shooting and Nadir called the police again;

101. Later still that evening, after Keisha was released from jail, she returned to Nadir's home with some of Althela's grandchildren, called other family members over, took over Nadir's bed that he shared with his deceased wife, all promoting Nadir to request assistance of the police again;

102. When the police returned, they said the adult children and grandchildren have the right to be there per Defendant Thomas' order and if Nadir called them out again to deal with the disturbance fostered by Keisha, they were going to arrest everyone;

103. Nadir was against forced to leave his home and contacted Defendant Rogers to help address the matter;

104. Defendant Rogers stated he would get in contact with Defendant Thomas and address the issue;

105. On information and belief, by April 17, 2018, Defendant Rogers had reached Defendant Thomas and made a deal, orchestrated by Defendant Thomas on behalf of his client(s), that if Defendant Thomas got Althela's children and grandchildren out of the house once and for all, Defendant Rogers would agree to dismiss all of Nadir's other issues raised in Court against Defendant Thomas' client(s) up until that point;

106. On information and belief, on or before April 17, 2018, Defendant Rogers made that deal with Defendant Thomas against the best interest of his client and without communication with his client or his client's consent;

107. Sometime between April 10 and April 17, 2018, Nadir was contacted by neighbors who lived in and around his homestead that his kitchen set had been set out on his front lawn but when Nadir drove by with his cousin, he did not see the kitchen furniture on the lawn, but he contacted Defendant Rogers and informed him of the neighbors communication and Defendant Rogers said he would take it up with Defendant Thomas;

108. On information and belief, some time before April 23, 2018, Defendant Thomas communicated with his client(s) that he was going to order Althela's adult children and grandchildren to vacate Nadir's homestead with knowledge that his client(s) had already been removing property and giving them more time to do so;

109.On April 23, before filing and recording the "Agreed" Final Order Quieting and Confirming Title and Dismissing The Remaining Claims of Danny Townsend" signed by Defendant Thomas on April 17, 2018, he issued an Order Granting Possession of his home to Nadir requiring that Althela's adult children and grandchildren vacate the premises and not remove any fixtures or damage or deface the property in any way, alerting them to the specific time they had to get out and retaining jurisdiction to address any claims for damages that might arise from Nadir (see Exhibit G, Order Granting Possession, Doc 30, Quiet Tile Suit);

110.On information and belief, Defendant Thomas was already aware of his client(s) determination to vacate the home with property belonging to the home, to the estate of Althela Townsend, and to Nadir, and, by retaining jurisdiction over that issue, with knowledge that he was otherwise going to be closing the case soon thereafter, Defendant Thomas was putting himself in position to continue to protect his client(s) and shield his client(s) from possible negative consequences of whatever actions his client(s) took to the best of his ability and to the extent that he could, without being discovered, using his judicial power;

111.On April 24, 2018, Nadir returned to his home and homestead to find that it had been ransacked and defaced and contacted Defendant Rogers who instructed Nadir to take it up with the police and informing Nadir that he would not be assisting Nadir with that matter separately or before Thomas;

112.Keisha also came to Nadir's home on that same day allegedly to return the key to the home, and said that before she let him get the house, she would burn it to the ground with him in it;

113.On information and belief, Defendant Rogers and Defendant Thomas had already reached an understanding without the consent or knowledge of Nadir that this case was over and already had a signed "agreed" order to that effect;

114.Nadir filed a police report about the stolen property and damage to his home and homestead and filed insurance claim with his insurance provider for his home, the same insurance provider that he and his wife had together for their home before she passed;

115.The police investigation found that the theft and damage seemed to be done maliciously;

116.The insurance investigation concluded that the property and damage was most likely caused by Althela's adult child(ren) and that Althela's insurance policy, which is now Nadir's insurance policy, did not cover theft and damage by owners of the home;

117.On information and belief, the insurance company was in touch with Defendant Thomas who advocated for his client(s) not be found to be at fault or blame for the conduct in taking property and damaging the home;

118.On or about April 26, 2018, Nadir sought an order of protection and temporary restraining order against Defendant Thomas' client(s) in municipal court:

119. On May 17, 2018. Defendant Rogers, Defendant Thomas, and Defendant Cody Gibson (who represented Keisha Gordon on the record) moved forward with the "Agreed" order that dismissed all of Nadir's claims in the Quiet Title case even as Nadir then and there had an open complaint about the theft and destruction of his home and property previously located therein (see Exhibit E, "Agreed" Order);

120. None of the matters actually raised by Nadir in Keisha and Keiona's Quiet Title were ever addressed by Defendant Thomas and were dismissed pursuant to an "agreed" order never agreed to by Nadir, and whose consent or agreement was never inquired into by Defendant Thomas;

121. Nadir, unaware that an "agreed' order had been entered closing the whole case against him and his interest and totally protecting the interests of Defendant Thomas' client(s), continued to address Defendant Rogers about his claims being addressed, both the old claims of opening of the estate, being granted a life estate, and receiving an accounting, as well as the new claims of theft and damage to property and the fraudulent taking of his insurance reimbursement for the mortgage payments he made which he had recently discovered;

122. Defendant Rogers, without making Nadir aware that there was no longer any case before Defendant Thomas, attempted to address Nadir's concerns about the property being stolen from his home through a Motion to Clarify the agreed

order, seeking Thomas' assistance in addressing the theft by his client(s) to no avail as Thomas simply ignored the Motion;

123. Recognizing the case was closed, Keisha's attorney of record withdrew from the case while Defendant Rogers sought another way to address Nadir's ongoing complaints while avoiding notifying him that the case had been closed with prejudice against his interest by him, Defendant Thomas and Defendant Gibson, and filed a Motion for Authority to Pursue Nadir's claim of fraud for the mortgage reimbursement check fraudulently cashed by Defendant Thomas' client;

124. On information and belief, Defendant Rogers filed the fraud claim with Defendant Thomas based on a prior agreement between him and Defendant Thomas that any issues involving his client would be brought to his attention first;

125. Although a hearing was scheduled to address Nadir's motion for authority, again Defendant Thomas ignored Nadir's motion and did not permit a hearing;

126. On information and belief, Defendant Thomas' actions to ignore Nadir's motions and issues, and to not provide him a day in court on any of his issues, were non-judicial decisions to protect his client(s) and disguise it as judicial;

127. With respect to Nadir's efforts to get a temporary restraining order against Defendant Thomas' client(s) in municipal court on or about April 26, 2018, a hearing had been scheduled and at the hearing the city prosecutor stated that

Nadir had better slow down in his actions against Defendant Thomas' client(s) or Defendant Thomas was going to mess around and take his home from him and give it to the kids;

128. In addition, after holding the hearing on Nadir order of protection, the municipal judge, Defendant Henry Clay, denied the TRO finding that Nadir's home was just as much the children's house as it was his;

129. On information and belief, Defendant Thomas had been in communication with the municipal judge and the city prosecutor concerning Thomas' client(s) and requested that the municipal judge deny Nadir's order of protection and indicated to the municipal prosecutor that he'd like to see his client(s) get the home;

130. Nadir continued in his efforts to get a restraining order against Defendant Thomas' clients by taking the matter to the justice court and bringing on Defendant Rogers to represent him;

131. The cases were held separately, with the first case being against Keiona Green and Nadir succeeded in getting a restraining order against the same;

132. The second case brought on for hearing was against Keisha Gordon before Defendant Judge Jimmy Morton, a white, male judge that, on information and belief, was a colleague of Defendant Thomas;

133. Defendant Morton denied Nadir a restraining order against Keisha on the basis that Keisha also had an ownership interest in the house, and refused to consider

the order to vacate and the prior decision granting a restraining order against Keiona who held the same ownership interest to which the white judge said he did not care;

134.Defendant Rogers did not show up to represent Nadir at that hearing, and, instead, had a paralegal appear to advocate for Nadir;

135.On information and belief, Defendant Thomas and his white cohorts including Defendant Morton and Defendant Rogers, made decisions against the interest of Nadir due to racial animus and targeting, and a similarly situated white person would not have been subject to the same treatment;

136.On information and belief, Defendant Rogers did not show up to represent Nadir against Keisha in order to not violate a prior agreement or understanding with Defendant Thomas that matters related to his client(s) and Nadir's house were closed;

137.Soon after the denial of the restraining order against Keisha, Defendant Rogers sent a letter withdrawing as counsel for Nadir;

138.Nadir appealed the denial of protection order to the Chancery Court seeking a permanent restraining order against Keisha Gordon, proceeding pro se;

139.On July 26, 2018, Nadir's petition for protection order came on to be heard before special family master Defendant Faye Peterson who declared that she was not certain she should be hearing the case because it was Defendant Thomas' baby so she was gong to refer it to him;

140.On information and belief, Defendant Thomas has made it clear when he retained jurisdiction after issuing a final order in his client(s) quiet title case, and by the statement of the family master, and from other evidence, that matters concerning Nadir's home and his client(s)' interest should be brought to him to address in order to provide the greatest possible protection for his client(s) without obviously exposing his true, nonjudicial intentions;

141.Following Defendant Peterson's decision, Defendant Rogers appeared again, purportedly to represent Nadir, and scheduled a hearing for Nadir's protection order case before Defendant Thomas for the same day and time that Defendant Thomas was scheduled to hear Nadir's motion for authority to pursue his fraud claim in Keisha's quiet title case);

142.Although a hearing was scheduled to address Nadir's petition for protection order, again Defendant Thomas ignored Nadir and did not permit a hearing;

143.On information and belief, Defendant Thomas' actions to ignore Nadir's petition, and to not provide him a day in court on any of his issues were non-judicial decisions to protect his client(s) and disguise it as judicial;

144.On information and belief, Defendant Thomas and Defendant Rogers colluded and conspired to deny Nadir the relief he was seeking and making plans to resolve the matters through settlement and agreement without Nadir's consent or agreement or knowledge and without the court being required to make

rulings on the record that would reveal Defendant Thomas' bias and favoritism based on his personal and/or attorney-client relationship;

145.Following the failure of any hearing to take place, Defendant Rogers arranged a hearing for October 31, 2018 with Defendant Thomas and Defendant Cody Gibson, who had come back to appear as the attorney for Keisha Gordon, without Nadir's knowledge or consent.

146.Defendant Rogers subsequently informed Nadir that a hearing would take place on October 31, 2018 at 9:00 am and told Nadir that he should come about 15 minutes early;

147.Nadir arrived on October 31, 2018 at 8:45 am for the hearing to witness Keisha, Defendant Cody, and Defendant Rogers coming out of a conference with Defendant Thomas at which point Defendant Rogers informed his client that an Order had been won granting him protection against Keisha;

148.Upon review of the order granted without Nadir's presence or consent, it did not provide Nadir protection from Keisha, but was worded to provide both of them protection from each other (see Exhibit H, Protection Order, Doc 6 in Protection Order case);

149.Moreover, the order went even further to require that any future matters concerning Nadir's homestead and Defendant Thomas' client(s) must be filed before Defendant Thomas only:

150.Defendant Thomas' protection order purposefully denied Nadir any future fair proceeding or adjudication of any issues and the benefit of the random assignment of judges to his cases in order for Defendant Thomas to continue to advocate for, represent, and provide aid to his client(s) and those Defendant Thomas had a personal relationship with to the detriment of Nadir;

151.Defendant Thomas' order made it clear what the facts when considered together had revealed already, that Defendant Thomas had a personal stake in the matters concerning his client(s), and that he had taken nonjudicial, out of court, actions to stay informed of what was going on with his client(s) in order to influence decisions in protection of the same, and to be provided with jurisdiction when he could to provide even greater protection from the bench;

152.On October 31, after being informed of the order of protection, Nadir inquired of Defendant Rogers the status of his fraud claim and other matters raised in the estate case and, for the first time, Nadir was informed that those matters had already been dismissed pursuant to the alleged agreed order enter in May of 2018 without Nadir's knowledge or consent;

153.Defendant Rogers subsequently withdrew again as counsel for Nadir;

154.A few weeks after he received the order of protection, in November of 2018, a fire was set to Nadir's home and homestead, and it caused extensive damage;

155.Nadir was reminded by the fire of the threats made by Defendant Thomas' client(s) that they would burn the house down before they let Nadir have it;

156.Nadir filed an insurance claim and police report related to the fire and communicated his suspicions that the fire was started by Althela's adult children;

157.Nadir hired Defendant Sharon Henderson, Defendant Ursula K. Mitchell, Defendant Henderson Law Office and Defendant Henderson Mitchell Law Group on January 10, 2019 to represent him in a deposition by the insurance company concerning the burning of his home and in his claims against the insurance company for the previously stolen property as well as the fire damage;

158.On February 1, 2019, Nadir submitted a motion for contempt before Defendant Thomas through his attorney, Defendant Henderson, to address his allegations that Defendant Thomas' client(s) started the fire and caused him loss of much of the remaining household contents and other fixtures and damages to his home;

159.Defendant Henderson was hired to file action in a separate court to address the claims against Nationwide for the fire and stolen property but brought the matter before Defendant Thomas;

160.On information and belief, Defendant Thomas worked in collusion with Defendant Henderson to deny him relief;

161.Defendant Thomas did not provide Nadir with a hearing on his motion or a ruling;

162.On information and belief, Defendant Thomas' actions to ignore Nadir's motion for contempt, and to not provide him a hearing or ruling were non-judicial decisions to protect his client(s) and disguise it as judicial;

163.After receiving no assistance from Defendant Thomas through Keisha and Keiona's quiet title case, On July 26, 2019, Nadir, through his attorney, Defendant Mitchell, submitted a petition to open an estate for his deceased wife to address all the matters avoided by Defendant Thomas in the quiet title case;

164.Nadir's petition to open an estate for his deceased wife was submitted by Defendant Mitchell through Nadir's nephew, David Robinson;

165.On information and belief, Defendant Thomas had directed Defendant Mitchell and Defendant Henderson that Nadir would not be allowed to submit the petition in his name because he was a convicted felon;

166.On information and belief, Defendant Thomas colluded with Defendant Mitchell and Defendant Henderson to have the Plaintiff address his claims for his stolen property and his mortgage reimbursement check through opening an estate and bringing those items into an estate that Defendant Thomas would be over and able to adjudicate for the benefit of his client(s);

167.On information and belief, Defendant Thomas planned to place himself over the adjudication of the Estate once filed to ensure the protection of his client(s);

168.On information and belief, Defendant Thomas also planned to have the insurance proceeds for the fire brought into the estate and adjudicated for the benefit of his client(s);

169.A hearing was scheduled on Nadir's petition to open the estate for Althela for August 8, 2019;

170.On information and belief, Defendant Thomas and Defendant Clerk made certain that Nadir's petition to open Althela's estate would be assigned and adjudicated by him personally because of his attorney-client and personal relationship with Althela and her child(ren), and denied Nadir the opportunity to be assigned a judge at random to ensure fairness;

171.On August 2, 2019, Nationwide Insurance filed its on complaint concerning the insurance payout for the house fire;

172.The complaint sought declaratory judgment that the payout of the insurance money were to the proper parties and named all of the heirs of Althela Townsend as adjudicated by Defendant Thomas but notably did not name the Estate of Althela Townsend as a party;

173.On the same date, Nadir amended his contempt complaint in the quiet title case to include the money to account for the property taken from the home by Defendant Thomas' client(s) in April of 2018;

174.On information and belief, Nationwide's interpleader lawsuit was encouraged, aided, directed, coordinated, requested or otherwise influenced by Defendant

Thomas and his communications with Nationwide, it's agents or assignees, on behalf of his Client(s) based on his personal and/or attorney/client relationship, that his client(s) should receive some of the insurance proceeds;

175.On August 8, 2019, Defendant Thomas' client(s) were served with the complaint by Nationwide concerning the insurance proceeds and immediately, through their attorney, another white male, Defendant John Reeves, filed their motion to set aside the agreed order and grant a partition sale of Nadir's home and homestead (asserting that due to the fire and the losses Nadir had suffered to the home, he had abandoned it and was no longer living there) and grant them the insurance proceeds for the damage to the home from the fire;

176.Additionally, at the hearing regarding the petition to open the estate, Defendant Thomas' client(s) objected to Nadir's nephew or Nadir being the administrator of the estate and instead promoted Keisha Gordon as the administrator or her Aunt, Defendant Mary Arnold;

177.Defendant Mitchell threatened the Plaintiff that Defendant Thomas would not permit the Estate to be opened if he did not agree to Defendant Mary Arnold as the administratrix as requested by his client(s);

178.Defendant Thomas appointed Defendant Mary Arnold as the administratrix without any recorded objection from the Plaintiff;

179.On information and belief, Defendant Thomas and Defendant Mitchell had a prior understanding that the Estate would be opened to ensure that Plaintiff's

claims were able to be controlled and adjudicated by Defendant Thomas in the interest of his client(s):

180. Also on August 8, 2019, in the Quiet Title Case, Defendant Thomas' client(s) filed a Motion to Set Aside the agreed order granting Nadir homestead, seeking a partition sale of Nadir's home and seeking an adjudication that the insurance proceeds from both the Nationwide action for the fire to his home, and from the earlier theft and damage to his home, belonged to the estate of Nadir's deceased wife and, therefore, to her children as heirs;

181. In the Motion, Defendant Thomas' client(s) admitted to taking furniture from Nadir's home;

182. Defendant Mary Arnold was also represented by the same attorney for Defendant Thomas' client(s), the white male, Defendant Reeves;

183. On information and belief, Defendant Thomas wanted a person who would work in the best interest of his client(s) as administrator and wanted a white attorney colleague who he could collude with outside of court and ex parte on any matters concerning his client(s);

184. On information and belief, Thomas colluded with Nationwide, Defendant Reeves, Defendant Henderson and Defendant Mitchell to coordinate actions in three supposedly separate matters to be addressed on the same date;

185. On information and belief, Defendant Thomas provided counsel and advice to his client(s) to submit the Motion to Set Aside the agreed order;

186.On August 16, 2019, Defendant Thomas scheduled a hearing for December 12, 2019 on his client(s)' motion while continuing to ignore Nadir's motion for contempt and amended motion for contempt;

187.On October 9, 2019, Nadir, through Defendant Henderson, filed a response in opposition to Keisha and Keiona's motion and raised again his motions for contempt and relief that had been already presented to Defendant Thomas twice before with no response;

188.On November 5, 2019, on Order of Default Judgment was entered against Defendant Thomas' client(s), which prohibited them from gaining any insurance money or benefit from the insurance payout for the fire because they chose not to respond to or otherwise answer the complaint made by Nationwide, and instead chose to rely on Defendant Thomas to protect their access to the insurance proceeds though the quiet title case (see Exhibit I, Doc 20, Order in Insurance case);

189.On information and belief, Defendant Thomas was in communication with his client(s), Defendant Reeves, and Defendant Henderson to explain that the Motion to Set Aside the agreed order would be dismissed and no further matters taken up in an effort to avoid being required to address the Plaintiff's contempt claims against his client(s);

190.On December 12, 2019, Defendant Thomas held a hearing on the motion filed by his client(s) to grant a partition sale and acquire the insurance proceeds that included a response from Nadir asserting his claims for contempt the third time;

191.At the hearing, Defendant Thomas' client(s) did not show and only the Plaintiff and his attorney, Defendant Henderson, were there, and Defendant Thomas dismissed the claims by his client(s) and did not address Plaintiff's claims for contempt because of, on information and belief, prior coordination with Defendant Henderson to not address any other matters;

192.On information and belief, Defendant Thomas had already communicated to his client(s) that there was no reason for them to come to the hearing because he wasn't going to grant their motion and he was not going to entertain Nadir's counterclaims or contempt charges;

193.Again, for the second time, the white attorney representing Defendant Thomas' client(s) withdrew from the case after the client(s) get what they needed from him but Defendant Thomas again left the case open;

194.On information and belief, Defendant Thomas communicated to his client(s) out of court that he would leave the Keisha Gordon and Keiona Green quiet title case open in case his client(s) needed to come to him for anything they had that avenue to him available;

195.On information and belief, Defendant Thomas and his white cohort, Defendant John Reeves, colluded and made decisions against the interest of Nadir due to

racial animus and targeting, and no similarly situated white male was or would have been subject to the same treatment;

196. On 1/31/2020, Defendant Mitchell, though retained by Plaintiff to represent him, filed a motion in the estate case as the representative of Defendant Mary Arnold and the estate, to have Plaintiff's property that had been stolen from his home, and his reimbursement check for the mortgage payments he made after his wife's death that had been fraudulently cashed by Defendant Thomas' client(s), turned over to the Estate, over which Defendant Thomas had also placed himself as the arbiter (see Exhibit J, Doc 12, 1/31/2020 Motion to Turn Over Property in Estate case);

197. These actions were not in Plaintiff's interest and were not communicated with Plaintiff;

198. The motion was entered by Defendant Clerk, in cooperation and collusion with Defendant Thomas, as the motion of decedent Althela "Green" Townsend;

199. Althea "Green" Townsend was a non-existent being but it was the name by which Althela was known to Defendant Thomas when she was his client while she was alive;

200. In addition, to the extent that Althela "Green" Townsend was a reference to Althela Townsend, she had been deceased and no actions or business could lawfully be done in her name;

201. On information and belief, any use of Althela "Green" Townsend indicated the non-judicial influence of Defendant Thomas over the matters alleged in this complaint;

202. On information and belief, Defendant Thomas, in collusion with his client(s), Defendant Mary Arnold, Defendant Reeves, Defendant Mitchell and Defendant Henderson orchestrated an effort to resolve Nadir's claims, which were still around and refusing to go away, by making them the claims of the estate and, therefore, having control over them as the judge;

203. Defendant Thomas never permitted a hearing or ruled on the Motion to Turn Over Property;

204. On information and belief, after Nadir terminated the services of Defendant Henderson and Defendant Mitchell, Defendant Thomas discovered another way to protect the interest of his client(s and the parties before him with whom he had a personal and/or attorney/client relationship upon which he based his decisions and engaged in non-judicial conduct sometimes disguised as judicial;

205. On information and belief, Defendant Thomas joined his efforts to bring the property and proceeds being claimed by Nadir under his authority through the estate case by focusing on also getting the proceeds achieved through the Insurance case under the estate;

206. On February 25, 2020, Nadir made a fourth attempt in the Quiet Title case, through Defendant Henderson to have his three motions for contempt addressed by scheduling yet another hearing on his motions;

207. Again, though a hearing was scheduled, Defendant Thomas never allowed the hearing to happen and never ruled on Nadir's motions for contempt;

208. On information and belief, Defendant Thomas avoided hearings and rulings addressing Nadir's motions for contempt, as well and other motions, claims, and allegations made by Nadir, whenever he considered that doing so would not be advantageous to his client(s);

209. On information and belief, Defendant Thomas worked in collusion with Defendant Henderson and Defendant Mitchell to deny him relief;

210. Between February 25, 2020 and March 3, 2020, Nadir became disenchanted with the services provided by Defendant Henderson and terminated her and Defendant Mitchell's services;

211. Nadir sought representation by the Cochran firm and secured representation but did not sign a contract for legal services;

212. On May 4, 2020, Defendant Cochran Firm, and Defendant Harris and Smith (deceased) of the Cochran Firm, entered their appearance through Defendant Harris on behalf of Danny Townsend in the Nationwide fire insurance case;

213. On June 11, 2020, Robert Schuler Smith (deceased) of Defendant Cochran Firm entered his appearance on behalf of Danny Townsend in the Quiet Title case;

214. No entry was made by Defendant Cochran Firm, or its attorneys, at this time into the Estate case;

215. On August 12, 2020, a settlement conference was scheduled in the Nationwide fire insurance case for December 9, 2020;

216. On September 8, 2020, a state court complaint was filed by Defendant Cochran Firm, Defendant Harris, and Attorney Smith (deceased), on behalf of the Plaintiff, for several state court violations including breach of contract and bad faith dealings against Nationwide, and intentional and tortious interference in the insurance contract and conversion against the children;

217. The state court complaint did not include the Estate as a Plaintiff or Defendant;

218. There were no proceedings in the Estate case between January 31, 2020 and December 2, 2020;

219. On information and belief, between January 31, 2020, and December 2, 2020, Defendant Thomas was in contact with his client(s), Defendant Cochran Firm, Defendant Harris, and Attorney Smith (deceased) out of court, and outside the presence and without the knowledge of Nadir, and discussed the Nationwide fire case, the State case against Nationwide and his client(s), and the removal of the State case to federal court;

220. On information and belief, between January 31, 2020, and December 2, 2020, Defendant Thomas was in contact with his client(s), Defendant Cochran Firm, Defendant Harris, and Attorney Smith (deceased), out of court, and outside the presence and without the knowledge of Nadir, and coordinated a strategy to protect the interest of his client(s) by ensuring that the interests of the Estate, through Defendant Mary Arnold, who was looking out for the interests of his client(s), would be represented by Nadir's counsel in the non-estate cases;

221. On information and belief, between January 31, 2020, and December 2, 2020, Defendant Thomas was in contact with his client(s), Defendant Cochran Firm, Defendant Harris, and Attorney Smith (deceased), out of court, and outside the presence and without the knowledge of Nadir, and coordinated and approved the strategy of Defendant Cochran Firm, through its Attorney Smith (deceased), entering the Estate case under the guise of representing Nadir's interests through Nadir's petitioner, his nephew David Robinson, in order to ultimately represent the Estate itself and the Defendant administratrix Mary Arnold;

222. On December 2, 2020, Defendant Cochran Firm, through Attorney Smith (deceased), entered appearance in the Estate case allegedly on behalf of David Robinson, and thereby Danny Townsend;

223. On December 9, 2020, Defendant Cochran Firm, through Attorney Smith (deceased), entered appearance in the Nationwide fire insurance case allegedly on behalf of Danny Townsend;

224.On December 9, 2020, during the settlement conference, Defendant Cochran Firm, through its attorney Smith (deceased) was recognized as being present to represent Defendant administratrix Mary Arnold and the Estate, not Plaintiff Danny Townsend;

225.On December 9, 2020, neither Defendant administratrix nor the Estate had any settlement authority to agree to any settlement on behalf of the Estate. In fact, the Estate was not even a party to the lawsuit;

226.A settlement was reached during the December 9, 2020 settlement conference and placed on the record;

227.The record of settlement establishes conclusively that the only terms agreed on in settlement was the total amount to be paid of Sixty Thousand Dollars ($60.000.00) with Fifty Thousand Dollars ($50,000.00) being to repair the home and Ten Thousand Dollars ($10,000.00) to address Danny Townsend's additional claims related to the fire insurance case;

228.On December 9, 2020, according to court records, acting through Defendant Cochran Firm attorney Smith (deceased), Danny Townsend made an "Ore Tenus" motion to dismiss Defendant Thomas' client(s) as Defendant(s) in his Bad Faith lawsuit filed in state court and removed to the federal court;

229.On December 9, 2020, according to court records, acting through Defendant Cochran Firm attorney Smith (deceased), Danny Townsend made an "Ore

Tenus" motion to join the "Estate of Althela Green Townsend" as a Plaintiff in his Bad Faith lawsuit filed in state court and removed to the federal court;

230. On December 9, 2020 and December 11, 2020, according to court records, acting through Defendant Cochran Firm attorney Smith (deceased), Danny Townsend made "Ore Tenus" motions to join the estate of "Althela Green Townsend" as a necessary party-defendant in the Nationwide fire insurance case;

231. The actions by Defendant Cochran Firm, Defendant Harris and Attorney Smith (deceased) to dismiss the Bad Faith state case removed to federal court, to make the estate a Plaintiff in that same case, to dismiss Defendant Thomas' client(s) in that same case, to include Defendant Adminstratix and the Estate as a necessary party-defendant in the Nationwide fire insurance case, and of making the settlement contingent upon Chancery Court approval in the Nationwide fire insurance case, along with the later action of making the Defendant adminstratrix and the Estate the recipient and manager of the distribution of the $50,000.00 to repair the home, and taking attorneys fees of 40% out of the repair amount to be paid to Defendant Cochran Firm, Defendant Harris, and Attorney Smith (deceased) in the Estate case, were all "back door deals" made without Danny Townsend, with his explicit objection to any such actions, and with awareness that gaining his agreement was, in fact, and would be, a roadblock to any deal which included such terms being reached;

232.On information and belief, the actions of Defendant Cochran Firm, Defendant Harris and Attorney Smith (deceased) were done in collusion with Defendant Thomas and Defendant Administratix in protection of Defendant Thomas' client(s) based on his personal and/or attorney/client relationship;

233.Defendant Administratrix and the Estate never made another appearance in the Nationwide fire insurance case or the Bad Faith case against Nationwide before or after the settlement conference even though both had been made a "party";

234.On December 23, 2020, still acting as lawyer for Defendant Administratrix and the Estate, and against the interest of their client Danny Townsend, Defendant Cochran Firm through its attorney Smith (deceased) petitioned for Defendant Administratrix and the Estate to receive the settlement authority to accept the settlement, receive the money, and disburse it as deemed appropriate to cover 40% to be awarded to Defendant Cochran firm in attorney fees, any liens, other expenses, and to make disbursements to contractors for repairs of Nadir's home;

235.On March 2, 2021, Defendant Cochran Firm attorney Defendant Harris, on behalf of the Plaintiff, along with attorneys for Nationwide, conferred regarding the settlement and Defendant Harris explained that a hearing was scheduled before Defendant Thomas on March 2, 2021, in the Estate case on the Petition for Defendant Administratrix's settlement authority;

236.The Estate and Defendant administratrix Arnold, which had been allegedly made a party in that case, was noticeably absent;

237. On information and belief, Defendant Cochran Firm attorney, Defendant Harris, and Defendant Thomas, had conferred ex parte concerning the settlement authority and already coordinated hearing dates and responses;

238. On information and belief, Defendant administratrix and the Estate were only made a party in order for Defendant Thomas to take control of the settlement proceeds on behalf of his client(s);

239. On March 18, 2021, Defendant Cochran Firm through its attorney Smith (deceased), submitted a notice of hearing for March 25, 2021 on Defendant Administratrix's petition for settlement authority;

240. On March 24, 2021, a day before the hearing, Defendant Mitchell submitted her Motion to Withdraw as attorney for the Estate and not Danny Townsend, claiming that David Robinson was the petitioner and alleging that Defendant Cochran Firm was now the attorneys for Defendant Estate and not for Danny Townsend, and identifying the attorney fees owed to her from Defendant Estate for her services;

241. Defendant Mitchell had no contract with Defendant Estate; her contract was with Danny Townsend;

242. David Robinson was not the petitioner for Defendant Mitchell's withdrawal;

243. On information and belief, Defendant Thomas had communicated with both the Defendant Cochran Firm attorney and the Defendant Henderson Mitchell Group attorneys and was informed of their disagreements with Danny Townsend, their

client, in attempting to do Defendant Thomas' bidding and Defendant Thomas indicated that he would ensure that the Estate would cover their legal fees for doing the dealing of the Estate and Defendant administratrix on behalf of his client(s) and against the interest of Danny Townsend who they had already agreed to represent;

244.On March 25, 2021, Defendant Thomas ordered that Defendant Mitchell could withdraw, and recognized Defendant Cochran Firm attorney Smith (deceased) as attorney for the Estate and Defendant administratrix, and claimed that David Robinson was the petitioner for the order;

245.David Robinson was not the petitioner for Defendant Thomas' order;

246.On information and belief, Defendant Thomas, in collusion and communication with Defendant Cochran Firm and Defendant Henderson Mitchell Law Group, orchestrated the withdrawal of Defendant Mitchell and the replacement of Attorney Smith (deceased) as attorney for the Estate and Defendant administratrix in attempt to sanitize the back room dealing that had been going on against Danny Townsend and on behalf of Defendant Thomas' client(s);

247.On March 25, 2025, against the will and over the pre-hearing objections of the Plaintiff, Danny Townsend, Defendant Thomas imposed a settlement against the Plaintiff with the rubber stamp of Defendant Cochran Firm;

248.In the order "approving" the "settlement" and granting settlement authority to Defendant Administratrix, Defendant Thomas referred to Defendant Administratrix as a "co-administrator" of the Estate;

249.Prior to the hearing, Defendant Cochran Firm, Defendant Harris and Attorney Smith (deceased) told the Plaintiff that they were going to have the settlement proceeds handled by the estate and take 40% out of the settlement amount for their legal fees;

250.Plaintiff objected to the plan and Defendant Cochran Firm, Defendant Harris and Attorney Smith (deceased) threatened him with being jailed by Defendant Thomas if he objected to the plan in front of Defendant Thomas;

251.At the hearing, Plaintiff did object to the use of the name "Althela Green Townsend" for the estate in light of the fact that when his wife made her transition, her legal name was Althela Watson Townsend and no entity existed under Althela Green Townsend at the time Atlethela passed away, and Defendant Thomas agreed and directed that any further Estate matter happen under the corrected name;

252.Plaintiff made no other objections on the record for fear of incarceration if such objections were raised;

253.On information and belief, the use of the name "Althela Green Townsend" for his wife evidenced the ex parte, nonjudicial, influence of Defendant Thomas on

the judicial matters because "Althela Green" was the name known to Defendant Thomas for his client prior to her death;

254.On information and belief, Defendant Thomas' recognition in his order of Defendant Administratrix as "co-administrator" was a further effort to hide and disguise his coordinated effort to deprive Danny Townsend of his rights under the law, and his manipulations and collusion with Danny Townsend's attorney, by alluding to the idea that David Robinson was a co-administrator of Defendant Estate and, thereby attempting to justify Danny Townsend's attorney being identified as the Estate and Defendant administratrix's attorney, and disguising that he was working against Danny Townsend's interests in the Estate case;

255.On information and belief, Defendant Thomas accomplished these actions in collusion with and with full knowledge of Defendant Clerk;

256.Following the "settlement" and terms being forced upon him by Defendant Thomas and Defendant Administratrix, Nadir challenged his attorneys, Defendant Cochran Firm and its attorneys, arguing that something needed to be done to fight back, unaware that Defendant Cochran Firm had represented the Estate and Defendant administratrix and supported and submitted the order;

257.On April 22, 2021, without receiving consent from or even notifying Nadir, who held both the possessory and homestead rights in the property, Defendant

Administratrix entered his home and changed all the locks to all the doors granting entrance;

258.On information and belief, Defendant Thomas and Defendant Administratrix colluded ex parte to have Nadir's property trespassed in the interest of Defendant Thomas' client(s) and due to his personal and/or attorney/client relationship with the same;

259.Nadir expressed concerns about those actions to "his" attorneys and Defendant Cochran Firm and its attorneys refused to act against Defendant Thomas and Defendant Administratrix;

260.On April 23, 2021, the Plaintiff filed a letter in the Estate case, pro se, attempting to fire Defendant Administratrix without the assistance of Defendant Cochran Firm and its attorneys because they refused to take action against Defendant Administratrix;

261.On information and belief, Defendant Cochran Firm and its attorney refused to take action against Defendant Administratrix because they had reached an understanding with Defendant Thomas that they represented Defendant Administratrix and the Estate and the interest of his client(s);

262.Defendant Cochran firm and its attorney held themselves out to the Plaintiff as representing him when, in fact, they were representing Defendant Mary Arnold and the Estate, and the interest of Defendant Thomas and his client(s);

263.On April 29, 2021, the Plaintiff, through his Defendant Cochran Firm attorney Smith (deceased), identifying once again as the attorney for Danny Townsend, submitted his Petition for Clarification of the Legal Name of the Deceased and the Estate to have Defendant Estate recognized and Althela Watson Townsend instead of as Defendant Thomas' client Althela Green Townsend;

264.On May 4, 2021, Defendant Thomas ordered the name of the decedent and Defendant Estate be changed to Althela Watson Townsend;

265.Following the refusal of Defendant Cochran Firm and its attorneys to help with challenging Defendant Administratrix, Plaintiff brought in Defendant Attorney Ahmad Smith for that purpose;

266.Until the time of the filing of this Complaint for relief, repairs to the home as a result of the fire have still not been made and Plaintiff has continued to suffer in his home as a result;

267.On May 20, 2021, Defendant Ahmad Smith filed an action on behalf of the Plaintiff to remove Defendant Administratrix which was amended on May 26, 2021 styled in the proper name of the Estate and the Decedent, Althela Watson Townsend;

268.On that same date, May 20, 2021, Defendant Thomas' white cohort, Defendant Reeves, entered the case allegedly representing Defendant Thomas' client, Keisha Gordon, styling his entry reverting back to Defendant Thomas' client, Althela "Green" Townsend;

269.On information and belief, Defendant Thomas and Defendant Reeves colluded ex parte to come into the case to represent the interest of his client(s) and Defendant Mary Arnold against the allegations in the action to remove her;

270.On August 10, 2021, without a hearing, Defendant Thomas denied the petition to remove Defendant Administratrix styling the order in the name of his client, Althela "Green" Townsend;

271.On September 14, 2021, Defendant Administratrix moved Defendant Thomas to permit her to hire his cohort, Defendant Reeves, as her attorney and the attorney for the Estate complete with his retainer fee and hourly rate;

272.In her motion, Defendant Administratrix identified the Cochran Firm attorney Robert Smith (deceased) as her and the Estate's former attorney;

273.In her motion, Defendant Administratrix also identified the Estate in the name of Defendant Thomas' client, Althela "Green" Townsend;

274.On the same date, Defendant Reeves entered his appearance to represent Defendant Administratrix, and Defendant Thomas ordered that he would be paid by the Estate with no opportunity given for any other party to file a response to Defendant Administratrix motion;

275.In all the entries by Defendant Thomas and Defendant Reeves, Althela "Green" Townsend was used as the name of the Estate in direct violation of Defendant Thomas' own order;

276.On information and belief, Defendant Thomas and Defendant Reeves had already colluded ex parte to have Defendant Reeves come in to represent the Estate because continuing to use the Plaintiff's supposed attorney for the Estate, Defendant Thomas and his client(s), and Defendant Administratrix's interests, and against the interests of the Plaintiff, was no longer tenable;

277.Defendant Thomas approved Defendant Reeves' representation of the estate and Defendant administratrix, along with his fees, immediately that same day without giving Plaintiff or any other interested persons or parties time to respond;

278.On September 16, 2021, Plaintiff sought reconsideration from Defendant of his order appoint Defendant Reeves as the attorney for the estate and Defendant administratrix pointing out that the administratrix and the estate had been operating against the Plaintiff's interest unlawfully and that Defendant Reeves was a part of that unfairness (Exhibit K, Doc. 30, 9/16/2021 Motion for Reconsideration in Estate case);

279.Almost two months later, with his motion for reconsideration still not addressed by Defendant Thomas, the Plaintiff discovered the information that established for him for the first time that Defendant Thomas was the lawyer for Althela and Keiona Green;

280.Plaintiff submitted a motion for Defendant Thomas' recusal from the case based on that information (see Exhibit L, Doc. 31, 11/11/2021 Motion for Recusal in Estate Case);

281.Four days after the recusal motion was filed, Defendant Reeves and Defendant Thomas agreed to Defendant Reeves being removed as the attorney for the estate and Defendant administratrix because his interest were adverse to the Plaintiff;

282.A day later, Defendant Thomas granted Plaintiff's motion and recused himself from the case calling himself "this Court" (Exhibit M, Doc. 33, 11/16/2021 Order of Recusal in Estate case);

283.Immediately following the recusal of Defendant Thomas, on the same day, Plaintiff submitted his affidavit in the estate case asserting his right to his life estate and homestead in his home following his wife's death as the surviving spouse and his desire to live out his days their undisturbed by the other heirs, the adult children of his wife (see Exhibit N, Doc. 34, 11/16/2021 Affidavit in the Estate case);

284.Defendant Thomas was aware all along of his relationship to the children and the decedent as their attorney but revealed nothing to the Plaintiff or the Court about his status nor did Defendant Thomas recuse himself sua sponte;

285.On information and belief, Defendant Thomas' reference to himself as "this Court" was an indication that he had involved the whole Court in backing him

and supporting him in his campaign against the Plaintiff in the interest of his client(s) and it revealed that so long as "this Court", Defendant Thomas' court, was involved in adjudicating the matters of the Althela estate and his client(s) interests, he would be influencing the decisions;

286. After the recusal of Defendant Thomas, Plaintiff sought to correct some of the biased, nonjudicial decisions made by Defendant Thomas and decided first to attack Defendant Thomas' order denying the removal of Defendant administratrix;

287. Plaintiff's filed and scheduled a hearing on May 31, 2022 concerning his Motion for Reconsideration of Defendant Thomas' order denying removal of Defendant administratrix (see Exhibit O, Doc. 36, 2/28/2022 Motion for Reconsideration in Estate case);

288. The Motion included an exhibit from the Plaintiff's health care provider that identified the anxiety and emotional distress the ordeal with Defendant Thomas and the obstruction of his peaceful and exclusive use his property had caused (see Exhibit P, Doc. 36, Exhibit F, 2/17/2022 Letter from Gordon Medical Arts Clinic in Estate case;

289. The hearing was held in front of Judge Denise Owens and, during the same period of time, Plaintiff filed a judicial complaint against Defendant Thomas and his attorney refused to represent him any longer;

290. After the hearing and prior to Judge Owens issuing a decision on the Motion for Reconsideration, Plaintiff submitted a letter, proceeding pro se, to the Court identifying that Defendant Thomas' client(s) had purchased his home at a tax sale for nonpayment of taxes and that Defendant Clerk, Defendant Assessor and Defendant Collector were all in the know about the issues (see Exhibit Q, Doc. 41, 6/3/2022 letter in Estate case);

291. On information and belief, Defendant Clerk, Defendant Assessor, and Defendant Collector, in collusion with Defendant Thomas, acted to undermine the Plaintiff's homestead and disability exemptions from paying taxes on his home as the owner of a life estate and instead orchestrated to have his ownership recognized as shared for the purpose of only identifying him as owing and having exemption over a pro-rata share of the taxable property than the full tax liability;

292. In effect, by Defendant Thomas effectively denying the Plaintiff a life estate, and communicating to the aforementioned Defendants that Plaintiff shared ownership of the home with his client(s), Defendants caused taxes to remain due on the property despite the Plaintiff's exemptions on his share, making the alleged share of the adult children due over year;

293. On information and belief, under the plan orchestrated by Defendant Thomas, in collusion with the other aforementioned Defendants, his client(s) could simply refuse to pay their share of the taxes and cause the Plaintiff's homestead

to be lost for failure to pay the taxes of the client(s) and then the clients could purchase the home at a tax sale and effectively take it from the Plaintiff;

294. On information and belief, pursuant to this plan, the Plaintiff has been forced to pay the taxes of Defendant Thomas' client(s) repeatedly in order to save his home from tax sale and when tax sales have happened, Defendant Thomas' client(s) have been permitted to purchase his home for those unpaid taxes and attempt to evade his homestead rights;

295. The plan above has caused the Plaintiff over $15,000.00 in the payment of taxes to save his home from Defendant Thomas' client(s) and any other potential circumventers of his exclusive and undisturbed possession;

296. After Plaintiff submitted is letter, Defendant administratrix submitted her own letter also to Judge Owens identifying the offering the sale of the Plaintiff's home as the solution to the dispute between the heirs;

297. On information and belief, Defendant administratrix and Defendant Thomas has colluded ex parte throughout the various stages of disputes related to the Plaintiff to support Defendant Thomas' client(s) to take his home from the Plaintiff or get money to allow him to keep it, in violation of the Plaintiff's homestead rights and right to his life estate;

298. On July 18, 2022, the Plaintiff revealed to the Court by letter that his attorney had not been representing him and that he was proceeding pro se;

299.On July 21, 2022, Judge Owens agreed to reconsider the order of Defendant Thomas to keep Defendant administratrix over the Estate and then determined that Defendant administratrix should remain in her position;

300.The order determining Defendant administratrix should remain in place was prepared by the Plaintiff's attorney who had already stopped representing him;

301.On information and belief, Judge Owens was in communication with Defendant Thomas and Defendant Ahmad Smith ex parte concerning the matter of Defendant Thomas' client(s) that were still before Judge Owens and had directed Judge Owens to keep Defendant administratrix in position to support the interests of his client(s);

302.On information and belief, Judge Owens decision to agree to reconsider Defendant Thomas' order simply to agree to the same result was an effort to sanitize the nonjudicial ruling motivated by personal animus and his attorney-client relationship as one that had been appropriate and lawful;

303.On information and belief, Judge Owens works with Plaintiff's attorney and Defendant Thomas ex parte to decide that Defendant administratrix would remain in place against the Plaintiff's interests;

304.On July 26, 2022, the Plaintiff filed his objection to Judge Owens order pro se identifying that his attorney was working in opposition to his interest and with Defendant administratrix;

305.Ultimately, Judge Owens retired from her position and the Estate case and Defendant Judge Tametrice Hodges took over the case;

306.From the start of her adjudicating the Estate case, Defendant Hodges has operated against the Plaintiff in the interest of Defendant Thomas and Defendant Thomas's client(s);

307.Defendant Hodges has made repeated allegedly judicial ruling directly to harm the Plaintiff and his interests and support the interests of Defendant Thomas and his client(s) including threatening the Plaintiff with contempt if he did not vacate his homestead to permit Defendant Thomas' client(s) to enter his property to which he had the right to exclusive possession and determining that the Plaintiff had vacated his home merely on the basis that the home did not have a gas meter, a meter which had been damaged by the fire and never repaired or replaced by Defendant administratrix and the Estate with the insurance proceeds;

308.Defendant Assessor, Defendant Collector, Defendant Clerk and Defendant Thomas also colluded in 2023 to cite the Plaintiff's property as being vacant and abandoned in order to deny him homestead protection and force a sale of his property;

309.All of these actions were taken against the interest of the Plaintiff to deny him his spousal rights, his property, his homestead, and the peaceful enjoyment and

exclusive possession of his property in the interest of Defendant Thomas's client(s).

**COUNT I**
**42 USC 1983**

310.Plaintiff incorporates and adopts all prior paragraphs, averments, and statement as if independently and specifically pled herein.

311.In Monell v. Department of Soc. Servs, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) the United States Supreme Court held that a state government subdivision can be found liable under Section 1983 if a policy of the subdivision itself causes the constitutional violation at issue. The Supreme Court said, "[i]t is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694.

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State …., subjects, or causes to be subjected, any citizen of the United States … within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983

312.Defendant County's taxation policy subjects the Plaintiff to unequal treatment and racial and gender harassment under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. They have used the taxation process to subject the Plaintiffs to surveillance, selective enforcement of laws

and codes, malicious taking of property, exorbitant taxation, and costly fines and legal fees, and physical and emotional injuries. All these actions were aimed at coercing the Plaintiff to abnegate, waive, yield, concede, or hold back from fighting for his right to peaceably own his home and homestead and be free of trespassers, squatters and nuisance themselves related to his property and home.

313.The Plaintiff was initially brought to the attention of the chancery court by. Thomas in collusion with his client(s), child(ren) of Plainitff's deceased wife, who was also a client of Thomas. Thomas and his cohorts went on the offensive and targeted the Plaintiff through the Chancery Court complex, including the tax assessor's office, the tax collector's office, the clerk's office, and the chancery court.

314.The more the Plaintiff refused to be silenced, and given that the Plaintiff was just some poor, criminalized, elderly, disabled and uneducated person, the chancery complex went to war.

315.The campaign that Thomas has instigated and directed against the Plaintiff is ongoing and it is unlawful. The unwelcome attention received by the Plaintiff, and injuries and insults being heaped upon the Plaintiff up until today are all a part of pattern and practice of targeted prosecution, and race, class, age and disability harassment and intimidation in violation of the guarantees of equal protection of the law contained in the 14th Amendment. The violation has been

led by Thomas and marshaled and managed by other players within the chancery complex and Nadir's attorney identified herein.

316.The individual Defendants are responsible for the emotional and physical injuries sustained by the Plaintiff as a result of their violations. They took all the actions averred herein while in their uniforms and under the authority of their offices and under the color of law. The behavior engaged in by the Defendants is clearly not in keeping with the established law. There is no room for personal vendettas, racial animus, and disregard for the cvil and constitutional rights of the Plaintiff. Defendant County is also squarely at fault. The use of its Chancery complex as a tool to enforce compliance with Thomas's will, as a tool for targeted enforcement, criminalization, and persecution under the law, in particular where racial, class, age, disability and education bias is involved violated the Plaintiff's right to equal protection of the law.

317.The Defendants have caused the Plaintiff hospital visits, emotional traumas, mental distress, legal fees, lost time and relationship with his children, interrupted his grieving of his wife, various periods of homelessness, court costs, loss of reputation, reduced earning potential and various others harms for which compensation is required. In addition, the behavior of the Defendants justify punitive damages and attorney fees.

**COUNT II**
**42 USC 1983**
**DEPRIVATION OF PROCEDURAL DUE PROCESS**
**(U.S. CONST. AMEND. XIV)**

318. Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

319. Plaintiff possessed constitutionally protected liberty and property interests including, but not limited to:

a. his homestead rights;
b. possessory rights in the marital residence;
c. insurance proceeds and contractual benefits;
d. causes of action asserted in state court;
e. rights to fair judicial proceedings;
f. rights to impartial adjudication;
g. rights to notice and opportunity to be heard;
h. rights to access the courts; and
i. rights arising under Mississippi inheritance and homestead law.

320. Defendant Thomas and all state actor defendants, while acting under the color of state law and in concert with one another, along with the Defendant county through the chancery complex, in the execution of its established policies through its chancery court apparatus deprived the Plaintiff of certain protected interests without due process of law.

321. The deprivation included, among other things:

a. ex parte communications;
b. manipulation of case assignments;
c. denial of hearings;
d. refusal to rule on pending motions;
e. entry of orders without Plaintiff's knowledge or consent;

f. intentional avoidance of adjudication of Plaintiff's claims;
g. coordinated settlement conduct adverse to Plaintiff;
h. deprivation of neutral judicial decision-making; and
i. interference with Plaintiff's access to meaningful judicial review.

322.The actions, to have Plaintiff taxed, fined, put out of his home, subject to arson, theft and force, and to pay excessive legal fees to repel and defend against these actions instigated based on a personal vendetta, an attorney-client relationship of a judge, and race, age, class, disability and educational attainment animus violated the Plaintiff's 14th amendment constitutional right to be free of such deprivations only after being provided with due process of the law under the 14th amendment, caused the Plaintiff substantial harm and damages, all in violation of the U.S. Constitution and 42 USC 1983.

323.Defendant Thomas acted outside the legitimate adjudicative role by engaging in private coordination, strategic planning, favoritism, attorney-like advocacy, and conduct undertaken in complete absence of neutrality.

324.As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of property, loss of use and enjoyment of his home, emotional distress, financial losses, humiliation, and deprivation of constitutional rights.

**COUNT III**
**42 USC 1983**
**VIOLATION OF FIRST AMENDMENT RIGHTS**
**(U.S. CONST. AMEND. I)**

325.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

326.The First Amendment to the United States Constitution protects, among other things, Plaintiff's rights:

a. to petition the government for redress of grievances;
b. to access the courts;
c. to engage in protected speech concerning judicial misconduct and property disputes;
d. to associate with counsel of his choosing;
e. to seek judicial relief without retaliation; and
f. to participate meaningfully in legal proceedings affecting his constitutional and property interests.

327.Plaintiff has been outspoken about his treatment pursuant to his First Amendment rights under the U.S. Constitution to freely assemble, freely speak, peaceably protest and petition the chancery court for redress for the wrongs against him through his constant and tireless political activism exhibited through attending numerous board of supervisor meetings, visiting chancery offices on numerous occasions to review laws and inquire into forms of redress, and to network and communicate with city, county, and state political officials, be aware of new mandates, holding press conferences in front of government building, and the like.

328.Additionally, Plaintiff engaged in constitutionally protected activity by:

a. filing motions and petitions in state court;
b. seeking restraining orders and judicial relief;

c. objecting to conflicts of interest and improper conduct;
d. asserting homestead and property rights;
e. seeking recusal of conflicted judicial officers;
f. challenging estate proceedings and settlements;
g. pursuing insurance claims and related litigation; and
h. attempting to expose alleged misconduct and conspiratorial activity.

329. In response to Plaintiff's protected conduct, Defendant Thomas, along with the other Defendants, acted jointly and in concert, under the color of state law, and with the support of Defendant County and the Chancery complex, to retaliate against Plaintiff and interfere with his First Amendment rights.

330. The behaviors of the individual defendants under the color of law, and the county, pursuant to procedures and policies it used to target the Plaintiff, unlawfully infringed on his protected speech and conduct under the First Amendment.

331. The retaliatory and suppressive conduct included but was not limited to:

a. denial of hearings;
b. refusal to rule on motions;
c. manipulation of judicial assignments;
d. ex parte coordination;
e. obstruction of Plaintiff's legal claims;
f. coercive settlement conduct;
g. interference with Plaintiff's attorney-client relationships;
h. suppression and dismissal of Plaintiff's claims without consent;
i. intimidation concerning Plaintiff's objections in court;
j. threats of incarceration or adverse rulings if Plaintiff opposed coordinated actions; and
k. actions designed to chill Plaintiff's willingness to continue petitioning the courts for relief.

332.Defendants' actions would deter a person of ordinary firmness from continuing to engage in protected First Amendment activity.

333.Defendants' conduct was motivated substantially or in part by Plaintiff's exercise of protected constitutional rights.

334.As a direct and proximate result of Defendants' conduct, Plaintiff suffered deprivation of constitutional rights, emotional distress, financial injury, loss of access to meaningful judicial remedies, humiliation, and other damages.

**COUNT IV**
**42 USC 1983**
**DENIAL OF EQUAL PROTECTION**
**(U.S. CONST. AMEND. XIV)**

335.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

336.Plaintiff is an African-American male.

337.Defendants intentionally treated Plaintiff differently from similarly situated white litigants and property owners.

338.Defendants' conduct was motivated in whole or in part by racial animus, discriminatory intent, racial favoritism, or deliberate indifference to Plaintiff's equal protection rights.

339.Defendants selectively denied Plaintiff protections, remedies, hearings, impartial judicial treatment, and enforcement of rights that would have been afforded to similarly situated white persons.

340.Defendants Reeves, Rogers, Thomas, Morton, and others acted jointly and in concert in ways that reflected racially disparate treatment and discriminatory decision-making.

341.Defendants' conduct deprived Plaintiff of equal protection of the laws in violation of the Fourteenth Amendment.

342.As a direct and proximate result, Plaintiff suffered damages including emotional distress, financial injury, humiliation, and loss of constitutional rights.

**COUNT V**
**42 USC 1983**
**DENIAL OF ACCESS TO COURTS**
**(U.S. CONST. AMEND. I & XIV)**

343.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

344.Plaintiff possessed a constitutional right to meaningful access to the courts and to present claims for adjudication before a neutral tribunal.

345.Defendants obstructed, impeded, delayed, manipulated, or prevented Plaintiff's ability to pursue legal remedies and obtain meaningful adjudication of his claims.

346.Defendants repeatedly:

a. ignored motions;
b. failed to hold hearings;
c. manipulated proceedings;

d. diverted claims;
e. entered orders without Plaintiff's knowledge or consent;
f. interfered with Plaintiff's chosen legal claims;
g. forced settlements adverse to Plaintiff; and
h. structured proceedings to shield favored parties from accountability.

347. As a direct result, Plaintiff lost opportunities to obtain meaningful relief and suffered actual injury in pending and contemplated litigation.

## COUNT VI
## 42 USC 1983
## CONSPIRACY TO DEPRIVE CIVIL RIGHTS

348. Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

349. Defendants reached agreements, understandings, tacit arrangements, or conspiratorial objectives to deprive Plaintiff of constitutional rights under color of state law.

350. The conspiracy included overt acts including:

a. ex parte communications;
b. coordinated litigation strategy;
c. manipulation of judicial proceedings;
d. denial of hearings;
e. suppression of claims;
f. coordinated settlement conduct;
g. manipulation of estate proceedings;
h. interference with insurance claims;
i. concealment of conflicts of interest; and
j. protection of favored parties from legal consequences.

351.Private Defendants acted jointly with state actors and became willful participants in joint action under color of law.

352.The conspiracy caused Plaintiff constitutional injury and financial harm.

**COUNT VII**
**42 USC 1985(3)**
**RACE-BASED CONSPIRACY**

353.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

354.Defendants conspired for the purpose of depriving Plaintiff, an African-American citizen, of equal protection of the laws and equal privileges and immunities under the laws.

355.The conspiracy was motivated by racial animus and discriminatory purpose.

356.Defendants committed overt acts in furtherance of the conspiracy as described herein.

357.As a direct result, Plaintiff suffered deprivation of constitutional rights, financial injury, emotional distress, humiliation, and other damages.

**COUNT VIII**
**42 USC 1986**
**NEGLECT TO PREVENT CONSPIRACY**

358.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

359.Defendants knew or reasonably should have known of the wrongful acts and conspiratorial conduct alleged herein.

360.Defendants possessed power to prevent or aid in preventing the commission of constitutional violations but neglected or refused to do so.

361.As a direct result, Plaintiff suffered damages.

## COUNT IX
## STATE-LAW CIVIL CONSPIRACY

362.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

363.Defendants combined, associated, agreed, and acted in concert to accomplish unlawful purposes and lawful purposes through unlawful means.

364.The conspiratorial conduct included fraud, concealment, abuse of judicial process, deprivation of property rights, interference with contractual relationships, and obstruction of Plaintiff's legal remedies.

365.Defendants committed overt acts in furtherance of the conspiracy causing damages to Plaintiff.

## COUNT X
## ABUSE OF PROCESS

366.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

367.Defendants Thomas, Reeves, Gibson, Rogers, Henderson, Mitchell, Harris, Cochran Firm, Arnold, and others knowingly used legal proceedings, judicial authority, estate proceedings, insurance proceedings, and settlement processes for ulterior and improper purposes unrelated to legitimate adjudication.

368.Defendants used judicial and legal process to:

a. deprive Plaintiff of property;
b. protect favored parties;
c. suppress Plaintiff's claims;
d. interfere with insurance proceeds;
e. obtain leverage over Plaintiff; and
f. shield co-conspirators from accountability.

369.Plaintiff suffered damages as a direct result.

## COUNT XI
## FRAUD AND FRAUDULENT CONCEALMENT

370.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

371.Defendants Reeves, Gibson, Rogers, Henderson, Mitchell, Harris, Cochran Firm, Arnold, and others knowingly made false representations, concealed material facts, omitted material information, and engaged in deceptive conduct concerning:

a. settlement terms;
b. representation of Plaintiff's interests;
c. agreed orders;
d. estate proceedings;
e. ownership interests;
f. insurance claims; and
g. legal representation.

372.Plaintiff reasonably relied upon certain representations and omissions to his detriment.

373.Defendants' conduct caused financial injury and other damages.

## COUNT XII
## BREACH OF FIDUCIARY DUTY / LEGAL MALPRACTICE

374. Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

375. Defendants Rogers, Henderson, Mitchell, Henderson Law Firm, Henderson Mitchell Law Group, Harris, Cochran Firm, Smith and other related Attorney Defendants owed fiduciary duties, duties of loyalty, duties of candor, and duties of competent representation to Plaintiff.

376. Defendants breached those duties by, among other things:

a. acting contrary to Plaintiff's interests;
b. failing to communicate material facts;
c. participating in unauthorized settlements;
d. concealing conflicts of interest;
e. acting in concert with adverse parties;
f. abandoning Plaintiff's claims; and
g. subordinating Plaintiff's interests to third parties.

377. As a direct and proximate result, Plaintiff suffered damages.

## COUNT XIII
## CONVERSION

378. Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

379. Defendant Arnold and other participating Defendants wrongfully exercised dominion and control over Plaintiff's personal property, insurance proceeds, reimbursement funds, household property, and related assets.

380.Defendants' conduct deprived Plaintiff of possession, use, and ownership rights.

381.Plaintiff suffered damages as a direct result.

**COUNT XIV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

382.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

383.Defendants engaged in extreme, outrageous, intentional, malicious, and reckless conduct exceeding all bounds of decency tolerated in a civilized society.

384.Defendants knew or should have known their conduct would cause severe emotional distress to Plaintiff.

385.Plaintiff suffered emotional distress, humiliation, anxiety, mental anguish, and related damages.

**COUNT XV**
**DECLARATORY RELIEF**

386.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

387.An actual controversy exists regarding the legality and constitutionality of Defendants' conduct.

388.Plaintiff seeks declarations including, but not limited to:

a. that Defendants violated Plaintiff's constitutional rights;

b. that certain actions were taken outside legitimate judicial authority;
c. that Plaintiff was deprived of due process and equal protection;
d. that ex parte and conspiratorial conduct violated federal law; and
e. that Plaintiff's rights in his homestead and related property interests are constitutionally protected.

## COUNT XVI
## INJUNCTIVE AND EQUITABLE RELIEF

389.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

390.Plaintiff faces ongoing and irreparable harm including continuing deprivation of property rights, interference with judicial fairness, and ongoing effects of unconstitutional conduct.

391.Legal remedies alone are inadequate.

392.Plaintiff seeks preliminary, permanent, and equitable relief including:

a. prohibiting further unconstitutional conduct;
b. prohibiting further ex parte involvement by conflicted actors;
c. requiring impartial adjudication of pending matters;
d. preventing continued interference with Plaintiff's property rights; and
e. all additional equitable relief deemed proper by the Court.

## COUNT XVII
## RECUSAL-RELATED AND STRUCTURAL DUE PROCESS RELIEF

393.Plaintiff incorporate and adopt all prior paragraphs, averments, and statement as if independently and specifically pled herein.

394.Plaintiff alleges that Defendant Hodges, and any Hinds County Chancery Court judge, possesses actual conflicts of interest based on the relationship to

Defendant Thomas who is the chief chancery court judge and who has prior attorney-client relationships, personal involvement, and non-judicial participation in matters over which Defendant Hodges and any other Hinds County Chancery Court judge under Defendant Thomas' jurisdiction exercise judicial authority in this matter.

395.Plaintiff further alleges that proceedings affected by those conflicts lacked constitutional neutrality and fundamental fairness.

396.Plaintiff seeks appropriate declaratory and equitable relief concerning proceedings tainted by unconstitutional bias, conflicts of interest, ex parte conduct, and structural due process violations.

397.Plaintiff seeks all relief permitted by law consistent with principles of federal jurisdiction and equity.

**COUNT XVIII**
**DAMAGES**

398.Plaintiff is owed the payment of his actual damages, consequential damages, compensatory damages, general and exemplary damages sustained because of the defendants' tortious conduct. Plaintiff has been financially damaged with medical and legal bills.

**COUNT XIX**
**PUNITIVE DAMAGES**

399.Pursuant to Mississippi Code §11-1-65 and other applicable law asserts her general and exemplary damages sustained because of defendants' failures.

## COUNT XX
## ATTORNEY FEES

400. Mississippi Code §11-55-7 and other applicable laws allows and plaintiff demands reasonable attorney fees and expenses when the court finds that there has been a violation and no reasonable written offer. To date, the defendants have offered no reasonable offer and have denied an obvious genuine claim put forth by plaintiff.

**WHEREFORE PREMISES CONSIDERED** Plaintiff Danny Townsend respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally where permitted by law, and award the following relief:

A. A declaration that Defendants' acts, omissions, agreements, customs, practices, policies, conspiratorial conduct, ex parte communications, retaliatory conduct, discriminatory conduct, and actions taken under color of state law violated Plaintiff's rights under the United States Constitution and federal law, including but not limited to the First and Fourteenth Amendments and 42 U.S.C. §§ 1983, 1985, and 1986;

B. A declaration that actions undertaken outside legitimate judicial authority, outside jurisdiction, in the absence of neutrality, or through improper ex parte and conspiratorial conduct are not protected by judicial immunity to the extent permitted by law;

C. A declaration that Plaintiff was deprived of procedural due process, equal protection of the laws, meaningful access to the courts, fair and impartial adjudication, and freedom from retaliation for exercising constitutionally protected rights;

D. Preliminary and permanent injunctive relief prohibiting Defendants, their agents, employees, attorneys, co-conspirators, and all persons acting in concert

with them from:
1. engaging in further unconstitutional conduct toward Plaintiff;
2. interfering with Plaintiff's property, homestead, inheritance, insurance, or possessory rights;
3. engaging in further ex parte coordination or communications concerning Plaintiff's pending matters;
4. retaliating against Plaintiff for pursuing legal remedies or exercising constitutional rights; and
5. interfering with Plaintiff's access to neutral and impartial judicial proceedings;

E. Appropriate equitable and recusal-related relief necessary to ensure that any continuing or future proceedings involving Plaintiff's rights are adjudicated by constitutionally impartial decision-makers free from conflicts of interest, bias, or improper influence;

F. Compensatory damages in an amount to be determined by the jury for:
1. loss of property;
2. loss of use and enjoyment of Plaintiff's home and homestead;
3. financial losses;
4. lost insurance benefits and proceeds;
5. litigation-related losses;
6. emotional distress;
7. mental anguish;
8. humiliation;
9. reputational harm; and
10. deprivation of constitutional rights;

G. Punitive damages against all individual Defendants whose conduct was intentional, malicious, reckless, wanton, discriminatory, retaliatory, fraudulent, oppressive, or undertaken with deliberate indifference to Plaintiff's federally protected rights;

H. An award of nominal damages where appropriate for violations of Plaintiff's constitutional rights;

I. An award of pre-judgment and post-judgment interest as permitted by law;

J. An award of costs, expenses, and disbursements incurred in this action;

T: (404) 599-0130
armsllc@representative.com

K. An award of attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988 and all other applicable provisions of law, to the extent permitted;

L. An order retaining jurisdiction to enforce all declaratory and injunctive relief granted herein;

M.Such additional legal, equitable, declaratory, injunctive, structural, or other relief as this Court deems just, proper, and necessary under the circumstances.

**PRESERVATION OF CLAIMS**

Plaintiff expressly reserves the right to amend this Complaint to:

a. add additional parties;
b. add additional claims;
c. supplement factual allegations;
d. conform the pleadings to the evidence;
e. seek additional relief; and
f. pursue all remedies available under federal and Mississippi law.

This 20 day of May 2026.

Respectfully submitted,

**DANNY TOWNSEND, PLAINTIFF**

BY: /s/ Ishmael Muhammad
ISHMAEL MUHAMMAD MSB#99213
ATTORNEY FOR PLAINTIFF

**OF COUNSEL:**

Ishmael Muhammad, Esq.
MUHAMMAD & ASSOCIATES, LLC
210 Lexington Avenue
Jackson, MS 39203

## CERTIFICATE OF SERVICE

I, Ishmael Muhammad, counsel for Plaintiff, do hereby certify that I have this day caused to be issued a summons to be served along with a true and correct copy of the above and foregoing *Complaint* to all the Defendants herein named:

THIS, the 20 day of May 2026.

/s/ Ishmael Muhammad
ATTORNEY FOR PLAINTIFF